Edward D. FINKE, Petitioner, Appellant,

v.

STATE of Minnesota, et al., City of Burnsville, Respondents.

No. C1–94–406.

Court of Appeals of Minnesota.

Sept. 6, 1994.

Review Denied Oct. 27, 1994.

---

James P. Larkin, Larkin, Hoffman, Daly & Lindgren, Bloomington, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Melissa L. Wright, Asst. Atty. Gen., St. Paul, for State, et al.

James C. Backstrom, County Atty., Michael R. Ring, Asst. County Atty., Hastings, for County of Dakota.

Thomas M. Scott, Campbell, Knutson, Scott & Fuchs, Eagan, for City of Burnsville.

Considered and decided by DAVIES, P.J., and LANSING and FORSBERG, JJ.

## OPINION

FORSBERG, Judge.

Outlot A of the Burnsville Millpond Second Addition Planned Unit Development (Millpond PUD) abuts Millpond Avenue, through which it enjoys indirect access to Cliff Road. As part of a government expansion of Trunk Highway 13 (T.H. 13) into a four lane highway, a median is being extended on Cliff Road. This median will prevent left turns from Cliff Road to Millpond Avenue, or from Millpond Avenue to Cliff Road, thereby reducing access between Cliff Road and outlot A of the Millpond PUD. Outlot A was excluded from condemnation proceedings because it does not abut Cliff Road or T.H. 13.

Appellant, a fee owner of outlot A, claimed the extension of the median violates a series of contracts made with the city and state. Appellant therefore sought inverse condemnation of outlot A against the State of Minnesota (State), Dakota County (County), and City of Burnsville (City). All parties moved for summary judgment, and Finke now appeals the district court's decision to award summary judgment to the State, County, and City. We affirm.

## FACTS

Appellant Edward Finke is the principal owner of Advance Acquisition Company (Advance)[1]. On July 6, 1977, Advance purchased ten acres of property in the Millpond

---

1. Advance Acquisition Company is the successor to Advanced Developers, Inc., which was the successor to Advance Packaging Corporation. Appellant Edward Finke was the principal owner of all three companies.

PUD. The property is located between Cliff Road and T.H. 13 and was divided into eight outlots, A through H. Advance intended to use the property for its dedicated purpose of commercial development under the PUD's second phase.

In December 1977, Advance applied to the City for concept approval of a special use permit for a commercial PUD. The City recommended that Advance prepare a concept plan "showing the relationship of traffic flow and highway access points on Cliff Road and Highway 13." On March 21, 1978, C & C Development Company (C & C) applied to the City for a special permit to allow development of an apartment complex and office and commercial buildings within the Millpond PUD. After several hearings, the City granted a conditional use permit to C & C for modification of the PUD. The approved site plan shows full access to outlot A from Cliff Road via Millpond Avenue. Relying on this plan, Advance contracted with C & C to develop the eight outlots. The preliminary plat indicated three existing access points along T.H. 13, and showed full access between Cliff Road and Millpond Avenue.

In September 1979, Advance and the City entered into a development contract to provide streets, sewer, and utility mains for the Millpond PUD. The development contract referred to the Millpond plat. The plat showed unrestricted access between Millpond Avenue and Cliff Road. To facilitate the development plans, C & C applied for and received a developer's conditional use permit with a site plan that again indicated unrestricted access from Millpond Avenue to Cliff Road.

In 1983, the City informed Advance they wished to make 117th Street the primary access to T.H. 13 from the Millpond PUD, and Advance agreed to exchange its three access points along T.H. 13 for the extension of 117th Street to T.H. 13. Advance requested and received a temporary limited use permit to carry out the extension of 117th Street. Two clauses of the agreement referred to the plat that showed unrestricted access to Cliff Road via Millpond Avenue.

In 1988, the State decided to expand T.H. 13 into a four-lane highway, and the City chose to upgrade certain streets and frontage roads in T.H. 13's vicinity. The T.H. 13 project includes plans to extend a median on Cliff Road. The extended median will prevent left-hand turns into or out of Millpond Avenue from Cliff Road, and reduce access to outlot A of the Millpond PUD. Advance objected to the new median, arguing that it would violate the PUD agreement, the limited use permit agreement, and other understandings with the City and State. Advance also claimed that the median would obstruct outlot A's property right to full access to Cliff Road, and submitted alternative proposals to avoid the extension of the median. The State, however, informed Advance that the median was required for traffic safety and was "not a negotiable issue." Although outlot A's access to Cliff Road will be reduced by the new median, outlot A does not abut Cliff Road. As a result, the state did not include outlot A in the condemnation proceedings against four other Millpond PUD outlots that abut T.H. 13.

In July 1993, appellant petitioned for an alternative writ of mandamus to compel the State, County, and City either to include outlot A in the original condemnation proceeding or initiate a new condemnation proceeding against it. The parties moved for summary judgment, and the district court granted summary judgment in favor of the City, County, and State. This appeal followed.

## ISSUES

1. Was the district court correct in finding as a matter of law that there were no contracts between Advance and the City or State that prohibited the extension of the median on Cliff Road?

2. Was the district court correct in finding the City was not a party in the condemnation proceeding?

3. Was the district court correct in finding as a matter of law that the owner of property that does not abut a street has no compensable right to convenient access to that street?

## ANALYSIS

Summary judgment may be awarded when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there are no genuine issues of material fact and either party is entitled to judgment as a matter of law. Minn.R.Civ.P. 56.03. In reviewing a district court's award of summary judgment, this court must determine if there are any genuine issues of fact and whether the district court erred in its application of the law. *City of Va. v. Northland Office Properties,* 465 N.W.2d 424, 427 (Minn.App. 1991), *pet. for rev. denied* (Minn. Apr. 18, 1991). The evidence must be viewed in the light most favorable to the nonmoving party. *Nord v. Herreid,* 305 N.W.2d 337, 339 (Minn. 1981). Nevertheless, to withstand a motion for summary judgment, a party must demonstrate that specific facts are in existence which create a genuine issue for trial. *Hunt v. IBM Mid Am. Employees Fed. Credit Union,* 384 N.W.2d 853, 855 (Minn.1986). Unsupported general statements of fact are not enough to preclude summary judgment. *See id.*

### 1. Breach of Contract Claim

The district court held there were no contracts between Advance and the City or State that precluded an extension of the median on Cliff Road. The district court characterized the Millpond PUD development contract as a mere "zoning classification" and stated that the limited use permit made no mention of Cliff Road medians. The district court also held that any damage claims against the State based on "implied and unwritten 'understandings'" would be unwarranted." Appellant, however, argues that the Millpond PUD development contract is an enforceable "contract" and that he must be compensated for its breach.

The existence and terms of a contract are questions of fact. *Morrisette v. Harrison Intern. Corp.,* 486 N.W.2d 424, 427 (Minn. 1992). Here, appellant asserts that he provided sufficient evidence to raise genuine issues of material fact regarding the existence of the contracts with the City and State to withstand summary judgment. He also asserts that the terms of these agreements

prohibit the extension of the median on Cliff Road. Appellant relies on the PUD development contract, the limited use permit, and extrinsic evidence that these agreements were made in the context of governmental concerns about access to outlot A.

■ The district court held that no contracts existed that supported appellant's claims, and that any extrinsic evidence of "implied understandings" was irrelevant because the contractual language is unambiguous on its face, and no extrinsic evidence is required. *Fena v. Wickstrom,* 348 N.W.2d 389, 390 (Minn.App.1984). Whether a contract's terms are ambiguous is a matter of law for the court to decide. *Lamb Plumbing & Heating Co. v. Kraus–Anderson,* 296 N.W.2d 859, 862 (Minn.1980). Thus, the true issue on appeal is whether the language of Advance's contracts was ambiguous or supported appellant's claims that the Cliff Road median could not be extended.

■ Appellant asserts the terms of the PUD development contract and limited use permit contracts are unambiguous. He argues that the PUD Development Contract and limited use permit contracts expressly refer to diagrams that show unrestricted access at the intersection of Cliff Road and Millpond Avenue, and that the diagrams are part of the contract. Thus, they carry the same weight when construing the contract as if directly incorporated within the text itself. *See Buchman Plumbing Co. v. Regents of the Univ. of Minn.,* 298 Minn. 328, 337–38, 215 N.W.2d 479, 485 (1974). Moreover, contract language and terms should be strictly construed against the drafter. *See Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 66 (Minn.1979). In short, appellant argues that the contractual language of the PUD Development Contract and limited use permit agreements expressly prohibits the extension of the Cliff Road median and that he must be compensated for their breach.

Appellant's interpretation of these terms, however, is inconsistent with the language in the rest of the contracts. First, the PUD's contract language dealt only with the engineering and financial aspects of certain improvements and made no provision restrict-

ing future modification of Cliff Road. Next, the PUD contract states that upon completion Millpond Avenue would become a dedicated public street. Finally, the language of the limited use permit does not support the proposition that the Cliff Road median could not be extended. Here, unlike the plans and specifications in *Buchman*, the diagrams were not expressly made a part of the contract but served only as a map to locate pertinent places referred to in the contract. *See Buchman*, 298 Minn. at 337–38, 215 N.W.2d at 485. The language of the limited use permit is clear:

> Also permission is granted to perform the grading for the construction of the 117th Street access to T.H. 13 *at the location shown on Exhibit "A"*.
>
> \* \* \* \* \* \*
>
> the applicant agrees to relinquish, at no cost to either party, all rights of access to T.H. 13 *as shown by a green X on Exhibit "A"*.

(emphasis added). Thus, we conclude that there are no terms in the PUD development contract or the limited use permit that limit the right of the City, County, or State to extend the median on Cliff Road, and that there are no contract terms in the PUD contract or limited use permit that create ambiguity about the right of the City to extend the median on Cliff Road.

## 2. Dismissal of City from Inverse Condemnation Claim

■ The district court dismissed appellant's inverse condemnation suit against the City for failure to state a claim. It concluded that the relevant roads were state and/or county roads, and that the City was not a condemning authority. Appellant contests this conclusion. He points to a joint acquisition agreement between the State and City. He also provides evidence that suggests the City thought it had potential veto power over the construction project's layout. Nevertheless, we need not address this issue since appellant's underlying inverse condemnation claim is otherwise precluded.

## 3. Inverse Condemnation Claim

■ Two elements must be satisfied to establish a compensable taking by the state in this case. There must be a "substantial invasion of [the owner's] property rights * * * [such that] he is deprived of the practical enjoyment of the property." *Alevizos v. Metropolitan Airports Comm'n of Minneapolis and St. Paul*, 298 Minn. 471, 485, 216 N.W.2d 651, 662 (1974). Additionally, the invasion must cause a "definite and measurable diminution" of the property's market value. *Id.* The disputed question of outlot A's lost access (invasion) and alleged resulting loss of market value are questions of fact. *See Alevizos v. Metropolitan Airports Comm'n*, 317 N.W.2d 352, 357 (Minn.1982). Nevertheless, appellant, as a matter of law, has no compensable right of convenient access to Cliff Road from outlot A for the state to invade.

Quoting *Hendrickson v. State*, the district court held that landowners have no compensable right of convenient access to streets which their property does not abut:

> Those who are not abutting owners have no right to damages merely because access to a conveniently located highway may be denied, causing them to use a more circuitous route.

*Hendrickson v. State*, 267 Minn. 436, 442, 127 N.W.2d 165, 170–71 (1964) (citing *Vacation of Part of Town of Hibbing*, 163 Minn. 439, 451–52, 204 N.W. 534, 539 (1925)).

Appellant argues that the district court fails to recognize the significance of the word "merely" in the *Hendrickson* decision. He claims that *Hendrickson* decided that "a number of sound factors" may give certain property owners the right to be compensated for restriction of access to a non-abutting street. *See id.* 267 Minn. at 442, 127 N.W.2d at 171. He argues that these factors include whether the original owner of the non-abutting property had dedicated other property to the public for roadway purposes, and whether the non-abutting land was previously part of a larger tract of land, which was used for a single purpose and which did abut the roadway. *See id.; Currell v. State, Dep't of Transp.*, 290 N.W.2d 772, 774–75 (Minn. 1980).

Appellant claims that these factors apply to outlot A because: (1) outlot A was previously part of a larger tract of land that abutted Cliff Road and T.H. 13; (2) the larger land tract was used for a commercial PUD, an innovative commercial facility that requires maximum accessibility; (3) appellant and his predecessors donated considerable land, money, time, and rights to the public in developing the PUD; and (4) zoning regulations treat PUDs as a single unit, so that a taking from any outlot within a PUD damages the entire PUD. Based on these factors, appellant argues that outlot A is entitled to special consideration, and that he should be compensated for its loss of convenient access to Cliff Road. Appellant asserts that he has presented sufficient evidence to prove these factors exist, entitling him to summary judgment as a matter of law. Alternatively, appellant states he is entitled to a trial on the factual issue of whether he succeeded to a right of outlot A's access to Cliff Road by virtue of outlot A being a part of a commercial PUD.

Nevertheless, we note that the language of *Hendrickson* limits compensation for loss of convenient access to owners of land abutting the affected street or road. *Hendrickson*, 267 Minn. at 443–45, 127 N.W.2d at 171–72. We further note that appellant misconstrues the "sound factors" listed in *Hendrickson*. The supreme court was describing the traditional reasons for affording a right of access to owners of abutting property. *Id.*, 267 Minn. at 442–43, 127 N.W.2d at 171. The court did not extend the right of convenient access to owners of non-abutting property, but only explained what a fact-finder should consider when determining whether an abutting owner had lost convenient access to the road. *Id.*, 267 Minn. at 445–446, 127 N.W.2d at 172–73.

We next turn our attention to *Currell*, a narrow exception to the general rule of *Hendrickson* that non-abutting property owners have no right to compensable convenient access to a public road or street. In *Currell*, the subject property abutted a frontage road that had access to an expressway. 290 N.W.2d at 774. When the state shut down the connectors between the frontage road and the expressway, the owner of lots 4 and 5 argued he had lost a right of convenient access to the expressway. *Id.* Since lots 4 and 5 had never abutted the main right of way, the supreme court held that the owner could only prevail if he established (1) lots 4 and 5 were once part of a greater parcel that included lot 1, which had abutted the original road that became the expressway; (2) lots 4 and 5 previously enjoyed access to the original road through lot 1; and (3) the state condemned lot 1 to build the expressway and provided a frontage road to Lots 4 and 5 in lieu of paying severance damages. *Id.* at 774–75. Here, appellant has failed to provide sufficient evidence to show his situation is similar to that of the plaintiff in *Currell*. Therefore, we conclude that his request for a trial on this matter is without merit.

Finally, because Minn.Stat. § 117.086, which allows certain noncontiguous tracts of land to be regarded as a single unit for determining eminent domain compensation, has no direct application to this case, we do not address it.

### DECISION

The district court correctly concluded that there were no genuine issues of material fact that precluded granting the City, County, and State summary judgment.

**Affirmed.**